UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

DARLENE JOHNSON,

    Plaintiff,

v.

DENNIS R. MCDONOUGH,

    Defendant.
_____/

Case No. 2:22-cv-122

Hon. Hala Y. Jarbou

## **OPINION**

In Count III of her complaint, Plaintiff Darlene Johnson contends that her former employer, the Department of Veterans Affairs ("VA"), retaliated against her for complaining about disability-related harassment, in violation of the Rehabilitation Act of 1973 (RA), 29 U.S.C. § 701, et seq. (*See* Compl. 9-10, ECF No. 1.) Defendant Dennis R. McDonough is the Secretary of the VA. Before the Court is Defendant's motion for summary judgment (ECF No. 54). For the reasons herein, the Court will grant the motion.

### I. BACKGROUND

The following is a summary of the relevant evidence with the facts construed in favor of Plaintiff. Plaintiff started working for the VA in 2006, in the position of charge nurse at the VA Medical Center in Iron Mountain, Michigan. (Johnson Dep. 8, ECF No. 55-1.) In 2011, the VA made her the program manager for "health promotion [and] disease prevention," a position she retained until her retirement in February 2021. (*Id.* at 9, 19.)

**A. Plaintiff's EEO Activity**

During her career at the VA, Plaintiff filed several equal employment opportunity ("EEO") complaints about conduct by her employer. In 2011, she filed an EEO complaint because she was

"being written up constantly[.]" (*Id.* at 15.) The VA moved her to the program manager position as part of a settlement of that complaint. In 2018, Plaintiff filed two more EEO complaints. The first, which she filed in April 2018, concerned an email containing private health information that another VA employee had distributed. (*Id.* at 20-21.) She cannot recall details of the other one she filed that year. (*Id.* at 23.)

### B. Plaintiff is Injured and Stops Working

In October 2018, Plaintiff was involved in a car accident while working. (*Id.* at 10.) She suffered a brain injury and did not return to work after the accident. (*Id.* at 23-24.) The VA placed her on leave without pay ("LWOP") in December of that year. (*See id.* at 27.)

### C. Plaintiff Applies for and Receives Workers' Compensation Benefits

Plaintiff applied for and received workers' compensation benefits from the Department of Labor's Office of Workers' Compensation Program ("OWCP") due to her injury. (*Id.* at 14.) The Federal Employees' Compensation Act (FECA), 5 U.S.C. § 8101 et seq., gives federal employees workers' compensation benefits for injuries sustained during the performance of their work. 15 U.S.C. § 8102(a). "[T]he OWCP is in fact a return-work program - not a retirement program." U.S. Department of Labor, Division of Federal Employees' Compensation, Procedure Manual, Chapter 2-0600 § 11.[1] The "OWCP is responsible for assisting injured workers with medical recovery from a work injury and facilitating a return to work as soon as practicable so that the length of disability is minimized." *Id.*, Chapter 2-0601 § 2. To obtain benefits, the employee must submit a claim in writing to the office of the Secretary of Labor. 5 U.S.C. § 8121.

FECA further provides that the employee "shall submit to examination by a medical officer of the United States, or by a physician designated or approved by the Secretary of Labor, after the

---

[1] https://www.dol.gov/agencies/owcp/FECA/regs/compliance/DFECfolio/FECA-PT2/group3#20600.

injury and as frequently and at the times and places as may be reasonably required." *Id.* § 8123(a). If an employee "refuses to submit to" the examination, their right to compensation "is suspended until the refusal . . . stops." *Id.* § 8123(d).

As at other VA facilities, there was an employee at the Medical Center responsible for overseeing the files of its employees applying for or receiving workers' compensation benefits. At the Medical Center, that employee was Tonia Pierce. (Lee Dep. 18, ECF No. 55-14.) But the medical records in those files were confidential; other VA staff could not access them.[2] (Rice Dep. 84, 89-90, ECF Nos. 55-2, 60-1; Lee Dep. 19-20, 22.)

### D. Plaintiff Considers Disability Retirement

In May 2019, Plaintiff began expressing interest in applying for disability retirement, though her desire to proceed wavered over the next several months. When applying for retirement benefits, a federal employee generally submits their application to the "personnel office of their employing agency." *See* Federal Employees Retirement System, *Appl. for Immediate Retirement*, https://www.opm.gov/forms/pdf_fill/sf3107.pdf. That office forwards the application to the agency's payroll office and then to the Office of Personnel Management ("OPM") for processing. *Id.* For the employee to be eligible for disability retirement, the employing agency must first "exhaust[] all reasonable attempts to provide . . . a reasonable accommodation or reassignment in which [the employee] can render useful and efficient service." OPM, *Types of Retirement – Disability*, https://www.opm.gov/retirement-center/fers-information/types-of-retirement/#url=Disability.

---

[2] Plaintiff argues that she signed a release of her medical information for human resources staff in 2018, but the release she provided is not signed. (*See* ECF No. 59-8.)

3

On May 8, 2019, Plaintiff sent an email to human resources staff at the VA asking for the "paperwork" to start the process for disability retirement. (5/8/2019 Johnson Email, ECF No. 55-3.) The next day, Human Resources Assistant Patricia Menza advised Plaintiff that she should not apply unless she was "disabled from returning to work," because that is part of the criteria for such a retirement. (May 2019 Menza-Johnson Emails, ECF No. 55-4, PageID.288.) Menza suggested that, if Plaintiff was hoping to return to work, she should wait to apply until her physician said she is unable to return. (*Id.*) Menza also gave Plaintiff additional information and informed her that the OPM would decide whether or not to approve her application for disability retirement. (*Id.*, PageID.290.) Plaintiff responded that she would wait to apply because she hoped to return to work. (*Id.*, PageID.288.)

Plaintiff contacted Menza again on July 26, 2019, requesting a contact at the VA to discuss her options for disability retirement. (July 2019 Johnson-Menza Emails, ECF No. 55-6, PageID.294.) In particular, she wanted to know "how it [would] work with DOL [workers' compensation] wages and [Social Security] disability[.]" (*Id.*) Menza informed her that she could not receive disability retirement benefits and workers' compensation benefits at the same time. (*Id.*) Two days later, Plaintiff asked Menza to "begin" her disability retirement process because a co-worker had "told [her] [she] should apply because [she] will be off of work for a year." (*Id.*, PageID.295.) But Plaintiff changed her mind about a week later, telling Menza that she would not be applying for disability retirement because she missed working and she "was not ready to give up on [her]self just yet." (8/5/2019 Johnson Email, ECF No. 55-7.)

Sometime later, Plaintiff apparently submitted a retirement application. On December 30, 2019, Michelle Menard, a human resources assistant at the Medical Center, told Plaintiff that she

4

had received Plaintiff's application. (12/30/2019 Johnson-Menard Emails, ECF No. 55-8.) But Plaintiff changed her mind again about a month later.

Meanwhile, in December 2019, the OWCP notified Plaintiff that she needed to undergo a medical examination in order to reassess her eligibility for workers' compensation. (12/6/2019 Letter, ECF No. 59-10.) In mid-January 2020, Plaintiff met with two physicians in connection with that review. (*See* Johnson Dep. 82.) Plaintiff's neurologist, Dr. Kaufman, opined that she had suffered "permanent effects" from a brain injury with no significant improvement expected and that she was not advised that she could return to work. (*Id.* at 82-83.) This report went "directly to OWCP." (*Id.* at 83, 85.) A psychiatrist and independent medical examiner, Dr. Pareek, told Plaintiff that she could "never work again[.]" (*Id.* at 39.) A few months later, based on Dr. Pareek's report, the OWCP apparently put Plaintiff in "PN status," which means "no potential for work." (*Id.* at 78.)

Nevertheless, on January 24, 2020, shortly after these doctors' visits, Plaintiff told human resources staff at the Medical Center that she "just found out from [her] [n]eurologist that he hasn't given up on [her] recovery." (1/24/2020 Johnson Email, ECF No. 55-9.) She said he had told her that her recovery "could take up to 2 years." (*Id.*) Consequently, Plaintiff asked to "rescind" her prior retirement applications. (*Id.*; Johnson Dep. 49.)

### E. Plaintiff Complains About Discrimination

On January 26, 2020, Plaintiff emailed Human Resources Specialist Rachelle Cherette, asking her to mail Plaintiff multiple copies of certain workers' compensation forms "ASAP." (Johnson-Cherette Emails, ECF No. 59-17, PageID.540.) The next day, Cherette responded that the forms "can be found and printed directly from the DOL website." (*Id.*) Plaintiff replied, copying Medical Center Director James Rice, Associate Director of Nursing and Patient Service Andrea Collins, and Plaintiff's second-line supervisor, Jill Bruno-Enright (Johnson Dep. 44),

5

saying, "I can't print anything or I wouldn't of asked.  I have a brain injury I'm not dumb . . . just need help if I ask.  This is disability discrimination.  Why do you not help when it is ask[ed] the once[?] . . . This is reprisal for my past EEO from 2011.  I consider it harassment too." (Johnson-Cherette Emails, PageID.539.)

### F.  VA Pursues a Medical Examination of Plaintiff

Separate from the review by the OWCP, the VA initiated its own review to determine Plaintiff's ability to return to work.  In September 2019, Cherette notified Plaintiff that, because she was on LWOP, the VA "has the right to review [her] continued employment after 1 year on LWOP."  (9/26/2019 Cherette Email, ECF No. 59-7.)

On March 27, 2020, Melissa Campbell, a nurse manager at the VA, signed a memorandum directed to Director Rice and Associate Director Collins.  (Campbell Mem., ECF No. 55-15.)  At the time, Campbell supervised Plaintiff's role.  (Campbell Dep. 25, ECF No. 55-16; Johnson Dep. 26-27.)  Campbell took on that role while Plaintiff was on leave.  (*Id.* at 25, 32.)  The memo explained that Plaintiff had been on leave without pay since December 24, 2018, and per VA policies, the agency can consider whether to separate an employee who has been on leave without pay for more than 365 consecutive days.  (*See* Campbell Mem., PageID.332.)  In particular, the VA Handbook provided that a "special physical examination may be required to solve questions of physical, cognitive or emotional ability to perform the essential duties of a position satisfactorily."  (VA Handbook, ECF No. 55-17, PageID.359.)  For instance, an examination "may . . . be necessary to determine physical, cognitive and emotional fitness to resume duty after illness [or injury]."  (*Id.* (brackets in original))  The handbook cautioned that an exam "may only be ordered or offered when the inquiry is job-related and consistent with business necessity."  (*Id.*)  To satisfy the latter requirement, "there must be a reasonable belief, based on objective medical

6

evidence, that the employee's ability to perform essential job functions will be impaired by a medical condition[.]" (*Id.*)

Campbell's memo noted that Plaintiff had sent the VA documentation in January 2020 indicating that she would not be able to return to work until at least September 13, 2020. (*Id.*) Also, Plaintiff had contacted the VA on January 24, 2020, and reported that "her recovery could take up to two additional years." (Campbell Mem., PageID.332; *see* 1/24/2020 Johnson Email.) Consequently, Campbell requested authority to order Plaintiff to undergo a fitness-for-duty examination. (*Id.*)

According to Campbell, human resources staff had prepared the memo and then she signed it; she did not request it. (Campbell Dep. 23-24.) When giving Campbell the memo for her signature, human resources staff reported that Plaintiff "had been out for 365 days, and that this was what the next step in the process would be." (*Id.* at 24.) VA Human Resources Specialist Donald Lee confirmed that he wrote the memo. (Lee Dep. 24.) According to Lee, because Plaintiff had been on leave for longer than a year, requiring her to undergo a medical examination was "the next step" if the VA wanted to "free up her position." (*Id.* at 21.) Similarly, Plaintiff acknowledged that the VA followed a policy to wait for a year before filling a position that was empty due to an employee taking leave for a work-related injury. (Johnson Dep. 70-71, 75, 77-78.)

According to Director Rice, the VA reviews the cases of employees who have been on leave for over a year to determine whether they are "fit to come back to work" so that there is no fraud or unnecessary expense. (Rice Dep. 28.) Without a formal medical examination, the employee would potentially remain on the VA's employment rolls in LWOP status for the rest of their life and the VA's "local facility" would have to pay the costs of workers' compensation. (*Id.*

7

at 32-33.)  If the VA determined that the employee could no longer perform her job, then it could separate them from employment and fill the position without double-encumbering it.  (*Id.* at 25, 32; Lee Dep. 70.)  The special medical examination was part of that removal process.  (Lee Dep. 70.)

After receiving the request from Campbell, Associate Director Collins recommended its approval and then Director Rice approved it.  (Collins Dep. 15, ECF No. 55-18; Rice Dep. 89.)  At the time, neither Campbell, nor Collins, nor Rice were aware that Plaintiff had applied for disability retirement.  (Campbell Dep. 31; Collins Dep. 15; Rice Dep. 82.)   In fact, Plaintiff's January 24 email had stated that she wanted to "rescind" her retirement applications.

**G. Plaintiff Renews Her Disability Retirement Application**

On April 3, 2020, the Veterans Health Administration Retirement Shared Service Office confirmed with Plaintiff via email that Plaintiff did not wish to proceed with her retirement application.  (Johnson-Torres Emails, ECF No. 55-10.)  On May 5, however, Plaintiff responded to that email asking to "reactivate" her application because she would not be able to return to work. (*Id.*)

Two months later, in June 2020, the OWCP changed Plaintiff's status to "PN," which means "Periodic Roll with No Re-Employment Potential."  (Case Status, ECF No. 59-6; VHA Directive 1609, PageID.462.)  Such cases are reviewed by the OWCP every three years.  (*Id.*, PageID.463.)

On August 7, 2020, Collins told Plaintiff that she had sent Plaintiff information about her disability retirement application as well as forms that Plaintiff needed to complete.  (8/7/2020 Collins-Johnson Emails, ECF No. 55-11.)   On September 28, 2020, Plaintiff's second-line supervisor, Bruno-Enright, completed a "Supervisor's Statement" in support of Plaintiff's retirement application.  (Johnson Dep. 44; Supervisor's Statement, ECF No. 55-12.)  In her

8

statement, Bruno-Enright wrote that the length of Plaintiff's expected absence was "unknown," and that the VA would be "unable to accommodate [Plaintiff] in [her] current position due to health related limitations." (*Id.*, PageID.310.)

On October 6, 2020, the VA informed Plaintiff that Collins had been assigned to work on her disability retirement, but that the OPM was the "final adjudicator" and would determine the amount of Plaintiff's annuity. (October 2020 Heckman-Collins Emails, ECF No. 55-13, PageID.315.) The next day, Collins emailed Plaintiff and told her that she would be reviewing the forms her office had received to make sure "we have everything we need to submit your case." (*Id.*, PageID.314.)

### H. VA Schedules Plaintiff's Medical Examination

In a letter signed by Rice on November 19, 2020, the VA notified Plaintiff that it had scheduled her for the medical examination at its facility in Milwaukee, Wisconsin, because she was "totally incapacitated from duty" due to her accident in October 2018. (11/19/2020 Letter, ECF No. 55-19, PageID.379-380.) Her inability to perform her duties was purportedly "having an adverse impact upon the ability of [the VA] to accomplish its mission." (*Id.*) The stated purpose of the examination was to determine whether or not she could perform her duties. If the examination revealed that she did not meet the physical requirements for her position, then she could be subjected to "personnel action," including "removal, disability separation, or disability retirement[.]" (*Id.*) Refusal to participate in the examination could "result in disciplinary action up to and including removal." (*Id.*, PageID.380.) The examination was scheduled for December 8, 2020. (*Id.*, PageID.379.) The letter listed Lee as a contact person. (*Id.*)

On November 21, 2020, Plaintiff contacted Campbell, her supervisor, by email, telling her to forward a message to Lee saying that she would need a driver to take her to Milwaukee, and that it would be difficult to find one. (November 2019 Johnson Emails, ECF No. 55-20,

9

PageID.382.) She explained that her anxiety, depression, and other conditions would make it difficult for her to travel to Milwaukee and that it would be hard for her husband to drive her because he was recovering from surgery. (*Id.*) In an email exchange with Lee, she asked to have the examination performed locally, by her own physician. (*Id.*, PageID.384.) Lee responded that the VA could not send a physician to examine her; the examination had to be performed in person by a physician qualified to perform one. (*Id.*) He told her that she had been approved for reimbursement of travel expenses and the cost of a hotel room, as well as a "per diem." (*Id.*)

On December 3, 2020, a few days before her scheduled examination, Plaintiff filed an EEO complaint against Lee, Rice, and Campbell in order to stop the examination or receive "some kind of protection." (Johnson Dep. 73-74.)

On December 4, 2020, Plaintiff sent a handwritten fax addressed to Lee, Rice, and Campbell, telling them that the OWCP had determined that she had "no potential for work." (Fax, ECF No. 59-23.)

On December 7, 2020, Plaintiff sent Pierce, Lee, Rice, and Campbell an email asking them to reschedule the examination because it would be unsafe for her to travel due to COVID-19. (12/7/2020 Johnson Email, ECF No. 59-16.)

On December 8, 2020, Tara Dowrick,[3] the Acting Associate Medical Center Director, reiterated to Plaintiff that the VA had scheduled her for an examination that day in Milwaukee, and that the examination would not be canceled or rescheduled. (12/8/2020 Dowrick Email, ECF No. 55-21.) Dowrick warned that failure to comply "could lead to administrative consequences up to and including removal from agency employment." (*Id.*)

---

[3] Tara Dowrick is now Tara Zoellar. (Johnson Dep. 64.)

10

### I. Plaintiff Does Not Attend the Examination

Plaintiff did not attend the medical examination. (Johnson Dep. 67.) The VA did not reschedule it or discipline Plaintiff for failing to attend. (*Id.* at 70.) It did not terminate her, suspend her, or issue her a warning letter. (*Id.* at 73.)

### J. Plaintiff Retires

In February 2021, the OPM approved Plaintiff's application for disability retirement and she retired. (*Id.* at 75.)

In this action, Plaintiff claims that the VA ordered her to undergo the medical examination in retaliation for her complaints about disability discrimination. Defendant argues that he is entitled to summary judgment.

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). Summary judgment is not an opportunity for the Court to resolve factual disputes. *Id.* at 249. The Court "must shy away from weighing the evidence and instead view all the facts in the light most favorable to the nonmoving party and draw all justifiable inferences in their favor." *Wyatt v. Nissan N. Am., Inc.*, 999 F.3d 400, 410 (6th Cir. 2021).

## III. ANALYSIS

When analyzing a retaliation claim under the RA, the Court employs the burden-shifting framework in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Gribcheck v. Runyon*, 245 F.3d 547, 550 (6th Cir. 2001).

> First, a plaintiff must set forth a prima facie case of discrimination. The burden then shifts to the employer "to articulate some legitimate, nondiscriminatory reason" for its actions. If the defendant carries this burden, the plaintiff must then prove by a preponderance of the evidence that the reasons offered by the employer were a pretext for discrimination.

*Id.* (quoting *McDonnell Douglas*, 411 U.S. at 802 (citations omitted)).

### A. Prima Facie Case

"A prima facie case of retaliation [under the RA] has four elements: 1) the plaintiff engaged in legally protected activity; 2) the defendant knew about the plaintiff's exercise of this right; 3) the defendant then took an employment action adverse to the plaintiff; and 4) the protected activity and the adverse employment action are causally connected." *Id.*

Plaintiff relies on her 2011 and 2018 EEO complaints as her protected conduct. She also relies upon her January 2020 email contending that providing her with a link to download forms instead of mailing them to her was disability discrimination, reprisal, and harassment. The asserted adverse employment action is the requirement that she undergo the medical examination.

Defendant argues that requiring Plaintiff to undergo a medical examination was not an adverse employment action. He also contends that Plaintiff has failed to demonstrate a causal connection between any protected conduct and an adverse employment action. The Court concludes that Plaintiff did not suffer an adverse employment action, so the Court need not address the causation element.

### B. Adverse Employment Action

As the Court explained in a previous order, for retaliation claims like the one here, an adverse employment action "is not limited to discriminatory actions that affect the terms and conditions of employment." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 64 (2006). The relevant question is whether "a reasonable employee would have found the challenged action materially adverse," i.e., whether the challenged action "might have dissuaded a reasonable worker

12

from making or supporting a charge of discrimination." *Id.* at 68 (citation and quotations marks omitted). The answer to this question generally "depend[s] upon the particular circumstances" because "[c]ontext matters." *Id.* at 69. "The showing required in a retaliation case is less burdensome than in a discrimination case." *Erwin v. Honda N. Am., Inc.*, No. 22-3823, 2023 WL 3035355, at *2 (6th Cir. Apr. 21, 2023). That said, "de minimis employment actions are not materially adverse for purposes of [a retaliation] claim." *Id.* Statutes like Title VII and the RA do not create "a general civility code for the American workplace"; thus, "it is important to separate significant from trivial harms." *White*, 548 U.S. at 68.

Plaintiff's assertion that she suffered an adverse employment action is a tenuous one because the VA did nothing more than tell her that she had to attend a medical examination or face possible consequences. After Plaintiff did not comply with the VA's demand, she suffered no consequences. At most, she suffered the inconvenience of having to respond to the VA's request by seeking an accommodation or attempting to explain why the examination was not necessary. But that inconvenience is not significant enough to rise to the level of a materially adverse employment action.

In ADA cases[4] involving fitness-for-duty examinations, the Court of Appeals has held that a fitness-for-duty exam "ordered for valid reasons can neither count as an adverse job action nor prove discrimination." *Pena v. City of Flushing*, 651 F. App'x 415, 422 (6th Cir. 2016) (quoting *Sullivan v. River Valley Sch. Dist.*, 197 F.3d 804, 813 (6th Cir. 1999)). Indeed, employers may 'requir[e] mental and physical exams as a precondition to returning to work' and [the Court of Appeals has] 'upheld a finding of insubordination for refusing to submit to such exams.'" *Id.*

---

[4] Courts use ADA case law when analyzing RA claims. *See Wilbanks v. Ypsilanti Cmty. Schs.*, 742 F. App'x 84, 87 (6th Cir. 2018).

13

(quoting *Sullivan*, 197 F.3d at 812). This Court noted the *Pena* decision when allowing Plaintiff's retaliation claim to proceed at the motion-to-dismiss stage. (6/28/2023 Order Adopting R&R 2, ECF No. 40.) By negative inference, that case suggests that ordering a fitness-for-duty examination for *in*valid reasons *could be* an adverse employment action, though the court in *Pena* did not expressly reach that conclusion.

Accepting the inference in *Pena*, this Court allowed Plaintiff's claim to proceed because her complaint suggested that the VA did not order her examination for valid reasons. In particular, Plaintiff alleged that the VA had already approved her for disability retirement before requiring her to undergo the exam. In other words, the examination was unnecessary because the VA purportedly knew that she was not able to return to work.

The record now before the Court does not support the facts she alleges in the complaint. That evidence shows that the OPM, not the VA, reviews applications for disability retirement; thus, the VA did not determine that she qualified for disability retirement before it required her to attend the examination. Plaintiff's second-line supervisor, Bruno-Enright, did assert in support of Plaintiff's retirement application that the VA could not accommodate Plaintiff in her current position due to health-related limitations; however, Bruno-Enright also stated that the length of Plaintiff's expected absence was unknown. Her statement did not rule out the possibility that Plaintiff could return to work in the future. At any rate, the OPM did not approve Plaintiff's retirement application until February 2021, several months *after* the VA required her to undergo the examination. Accordingly, neither the VA nor the OPM had approved Plaintiff for disability retirement before the VA required the medical examination.

The evidence also shows that the VA had a valid reason for ordering the examination. Plaintiff had been on LWOP for over a year due to an injury, and she gave the VA contradictory

14

information about her future ability and intent to return to work. At times, she indicated she might recover from her injury and return to her position. At other times, she indicated that she was permanently disabled and wanted to apply for disability retirement. Meanwhile, the VA had to determine whether to keep her on its employment rolls or separate her. If she was able to return to work, even if it was in a different role or under "restricted duty," she would have to do so. (Rice Dep. 25, 28, 82, 85-86.) If she could not return immediately but might recover in the future, there could be reason to continue her leave status. (*See* VHA Directive 1609, ECF No. 59-3, PageID.464 (noting that where an injured employee has been on LWOP for over a year, "HRMS or ELR may determine that it is appropriate to separate the injured worker from the agency rolls, or to remain on the agency rolls based on the potential for a return to work in the future").) But if she could not return to work for the foreseeable future, there was no reason to keep her on leave status with her position encumbered. As Rice testified, the VA conducted a fitness-for-duty examination of its employees on LWOP status before separating them from its employment rolls, in accordance with the VA Handbook and its general practice. And here, Plaintiff was injured but told the VA that she might recover, which put her potential ability to work into question. The VA ordered the examination to resolve this issue, which was a valid reason.

It is true that, by the time of the examination date in December 2020, Plaintiff had submitted her application for disability retirement; however, that application did not obviate the need for the VA's examination because the OPM had not yet approved it, meaning that Plaintiff was still on the VA's employment rolls under LWOP. There is no evidence that anyone involved in requesting or scheduling the medical examination was aware of her retirement application. Even

15

if they became aware of the application at some point prior to December 2020,[5] they would have had reason to continue with the examination in order to decide whether to continue her leave status or separate her. They could not have known when or whether the OPM would approve the application.

Similarly, the OWCP's determination that Plaintiff could not return to work did not render the VA's decision improper. The OWCP is a separate agency overseeing a related, but separate question. The OWCP was not responsible for assessing how and when the VA should separate one of its employees on leave status. Plaintiff "may not dictate the terms of [her] medical examination" by relying upon records produced by a physician other than the one specified by her employer. *Sullivan*, 197 F.3d at 809. And in any case, there is no evidence that anyone working for the VA other than Pierce had access to the medical files used by the OWCP to support its determination. Pierce was not involved in scheduling the medical examination at issue. Plaintiff did send a fax to the VA regarding her workers' compensation status a few days before her examination date, but it is not clear what records or information that fax contained other than Plaintiff's handwritten assertion that the OWCP had determined that she had no potential for work. That assertion did not eliminate the need for the VA to conduct its own examination.

Plaintiff notes that a portion of the VA Handbook (dated 2022, after the relevant time period) required the VA to use a fitness-for-duty examination as a "last resort when the VA cannot accommodate the employee in the current position and cannot find an appropriate reassignment position." (VA Handbook 5975.1, ECF No. 59-20, PageID.551.) If anything, that provision *supports* the VA's decision. A few months before the scheduled examination, Plaintiff's second-

---

[5] On September 25, 2020, Plaintiff sent Campbell, Menard, and Bruno-Enright and others an email asking for copies of "paperwork I faxed to you and emailed for disability retirement." (9/25/2020 Johnson Email, ECF No. 59-14.)

line supervisor asserted that the VA could not accommodate Plaintiff in her current position. But more importantly, the provision cited by Plaintiff concerns the VA's duty to provide reasonable accommodations for employees; it did not provide the general standard for when fitness-for-duty examinations are appropriate under the VA's handbook for injured employees. Thus, under *Pena*, the VA's examination requirement was not an adverse employment action because it was not improper. It was job-related and consistent with the VA's business necessities.

But even if the examination was improper or unnecessary, Plaintiff's claim would still fail. The context of the VA's conduct makes her argument for adverse employment action especially tenuous because she was effectively unemployed at the time. In other words, she was not performing her job responsibilities and she was not receiving pay. Instead, she was on LWOP, a status that she did not expect to maintain indefinitely. In fact, she acknowledged that the VA could fill her position because she had been on leave for more than a year. Thus, there was little the VA could have done at that point that would have adversely impacted her employment.

And because the VA did not subject Plaintiff to any consequences for not complying with its order, that order amounted to no more than a threat of possible adverse action. But here, the VA did not tie that threat to any protected conduct. *See Spence v. Donahoe*, 515 F. App'x 561, 573 (6th Cir. 2013) (holding that employer letter with implied threat of termination was not an adverse action where, among other things, it did not "threaten retaliation for pursuing a discrimination charge").

Moreover, any threat was an empty one in Plaintiff's case. According to the scheduling letter and Dowrick's email, Plaintiff faced the possibility of "disciplinary action" or "administrative consequences" "up to and including removal from agency employment." But by the time of her scheduled appointment, Plaintiff knew that she could not return to work and she

17

did not intend to do so. Terminating her for not complying would not have adversely impacted her because her workers' compensation benefits would have continued (*see* VHA Directive 1609, PageID.464 ("In such cases where an injured worker is no longer on the Agency rolls, compensation and WCP case management requirements will continue.")), and she still would have been eligible for disability retirement, *see* OPM, *Types of Retirement – Disability* (noting that an application for disability retirement is due within one year *after* separation); *Morrison v. Department of the Navy*, No. PH-0752-14-0669-I-1, 2015 WL 738110, at *2 (M.S.P.B. Feb. 23, 2015) ("Retirement benefits earned over the course of one's federal career are generally available upon separation from federal service, even when that separation is agency initiated."). There is no evidence that any disciplinary action would have impacted those benefits. Thus, the threat of removal or discipline for failing to attend the medical examination was not one that a reasonable employee in Plaintiff's circumstances would have considered materially adverse.

Plaintiff also argues that the VA failed to accommodate her when she raised concerns about attending the medical examination. That failure does not add anything to the adverse action component of her retaliation claim because the purported adverse action remains the same, i.e., the VA ordered her to attend a medical examination that she did not attend.[6]

In short, Plaintiff did not suffer an adverse employment action. Accordingly, she has not established a necessary element for her retaliation claim under the RA.

## IV. CONCLUSION

For the reasons stated, the Court will grant Defendant's motion for summary judgment and dismiss Plaintiff's claim in Count III of the complaint. Because that claim is the only one

---

[6] Although a failure to accommodate can give rise to a separate claim under the RA, Plaintiff expressly abandoned such a claim when responding to Defendant's motion to dismiss. (*See* 5/5/2023 Report & Recommendation 8 n.3, ECF No. 36 (adopted June 28, 2023).)

remaining, the Court will dismiss the case. An order and judgment will enter consistent with this Opinion.

Dated: May 13, 2024  /s/ Hala Y. Jarbou
HALA Y. JARBOU
CHIEF UNITED STATES DISTRICT JUDGE